Joseph G. Pia (9945)
Chrystal Mancuso-Smith (11153)
**PIA ANDERSON DORIUS REYNARD & MOSS**
222 S. Main Street, Suite 1830
Salt Lake City, UT 84101
Tel. (801)350-9000 / Fax. (801)350-9010
Joe.pia@padrm.com
Cmancuso@padrm.com

Murphy S. Klasing (pro hac granted)
**WEYCER, KAPLAN, PULASKI & ZUBER, P.C.**
11 Greenway Plaza, Suite 1400
Houston, Texas 77046
(713) 961-9045 / Fax.(713) 961-5341
mklasing@wkpz.com

*Attorneys for Plaintiff Fouzi Al-Fouzan*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| **FOUZI AL-FOUZAN** | § | |
| **Plaintiff,** | § | **PLAINTIFF'S SECOND** |
| | § | **AMENDED COMPLAINT** |
| **V.** | § | |
| | § | |
| | § | |
| **ACTIVECARE, INC., JAMES JOSEPH** | § | |
| **DALTON, ADP MANAGEMENT** | § | **Civil No. 2:15-cv-00373-BCW** |
| **CORPORATION, & 4G BIOMETRICS,** | § | |
| **LLC, predecessor in interest to and/or** | § | |
| **n/k/a ACTIVECARE BIOMETRICS** | § | **Magistrate Judge Brooke C. Wells** |
| **Defendants.** | § | **JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Plaintiff FOUZI AL-FOUZAN, by and through counsel of record, files this Second Amended Complaint against Defendants ACTIVECARE, INC. ("ActiveCare"), JAMES JOSEPH DALTON ("Dalton"), ADP MANAGEMENT CORPORATION ("ADP"), and 4G BIOMETRICS, LLC, predecessor in interest to and/or n/k/a ACTIVECARE BIOMETRICS ("4G"), hereinafter collectively referred to as "Defendants." and alleges as follows:

### JURISDICTION AND VENUE

1.     Jurisdiction is proper under 28 U.S.C. § 1332(a)(2) because there is complete diversity among the parties as this is a suit between a foreign citizen and U.S. citizens, and the amount in controversy is in excess of $1,000,000, and thus exceeds $75,000, exclusive of interests and costs..

2.     Jurisdiction is also proper because Plaintiff, ActiveCare, and ADP irrevocably consented to the jurisdiction of the courts of the State of Utah and of any federal court located in Utah in connection with any action or proceeding arising out of or relating to the Agreement subject of this lawsuit.  4G is a wholly owned subsidiary of ActiveCare.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) in that all Defendants are either residents of Utah or resides and/or maintains its principal place of business in this district.  *See also* 28 U.S.C. §§ 125.

### DEMAND FOR JURY TRIAL

4.     Plaintiff hereby demands a jury trial as to all issues or claims so triable.

**THE PARTIES**

5.     Plaintiff FOUZI AL-FOUZAN, an individual, is a citizen of Kuwait. Plaintiff is a signatory to the Agreement subject of this lawsuit.

6.     Defendant ACTIVECARE, INC. ("ActiveCare") is a corporation incorporated under the laws of Delaware with its principal place of business at 1365 West Business Park Drive, Orem, Utah County, Utah 84058.  James Dalton, Robert Welgos, and Jeff Peterson are its directors.  James Dalton is Chief Executive Officer ("CEO"), Jeff Peterson is Chief Financial Officer ("CFO"), Darrell G. Meador is Vice President of Sales and New Business Development.

7.     Defendant ADP MANAGEMENT CORPORATION ("ADP") is a corporation incorporated under the laws of Utah with its principal place of business at 1401 N. 1075 West Ste. #240, Farmington, Davis County, Utah 84025.

8.     Defendant JAMES J. DALTON ("Dalton") is an individual who resides <u>at 3133 Mountain Ridge Ct., Park City, Utah 84060</u>.

9.     Defendant 4G BIOMETRICS, LLC, predecessor in interest and/or n/k/a ACTIVECARE BIOMETRICS ("4G") is a wholly owned subsidiary of ActiveCare and a Texas limited liability company with its principal place of business in Lewisville, Texas. Darrell G. Meador, Kenith Lewis, and Randall K. Gardner were its operating managers at relevant times.

10.     All Defendants listed above have waived service and appeared herein.

**STATEMENT OF CLAIM**

*<u>The Parties and Pre-Agreement Events</u>*

11.     ActiveCare was formed in 1998 as a wholly owned subsidiary of SercureAlert, Inc. d/b/a Track Group, Inc. ("SecureAlert"). Dalton co-founded and served as Director of SecureAlert from 2001 until 2009. David Derrick ("Derrick") co-founded and served as Chairman and CEO of SecureAlert from 2001 until 2011. In 2009, SecureAlert's interest in ActiveCare was reduced through the sale and transfer of stock, and name was changed to ActiveCare.

12.     During the year ended September 30, 2008, ActiveCare sold over two (2) million shares of common stock to ADP for over $2 million in sale proceeds. At the time, ADP was an affiliate of SecureAlert, and was also an accredited investor of ActiveCare. Dalton became Chairman of ActiveCare in 2008, and CEO of ActiveCare in or around October of 2010.

13.     On June 24, 2010, ADP agreed to loan and/or invest over $1 million in additional working capital to SecureAlert. At the time, ADP was controlled by SecureAlert's CEO. SecureAlert had also agreed to pay ADP a consulting fee of $20,000 per month and the salary of Derrick to assist SecureAlert in developing new business direction and providing introductions to financial partners.

*The Agreement*

14.     On September 6, 2010, ActiveCare, ADP, and Plaintiff signed an Escrow/Subscription Agreement (hereinafter the "Agreement") whereby Plaintiff invested one (1) million dollars in ActiveCare in exchange for one (1) million Common Shares of ActiveCare.

Section 2(b) of the Agreement states, in relevant part, as follows:

At the end of six months from [September 6, 2010], [Plaintiff] has the right to require [ADP] to either repurchase the Common Stock at a price equal to $1.00 per share or reset the purchase price to the closing price as of the 6 month anniversary date and issue additional shares to compensate for the reset purchase price.

Section 2(b) will be referred to herein as Plaintiff's "Repurchase Option."

15.    Section 8(a) of the Agreement states in relevant part that the Agreement "may be modified only by a written instrument duly executed by the party to be charged." The Agreement has not been modified in accordance with Section 8(a).

16.    Pursuant to the terms and conditions of the Agreement, in September of 2010, Plaintiff invested one (1) million dollars in ActiveCare and received one (1) million Common Shares of ActiveCare.

17.    At the time the Agreement was signed, Dalton, ADP, Derrick, and an entity owned by Derrick owned approximately 40% of the Common Shares of ActiveCare, and ADP was under shared control of Dalton (ActiveCare's Chairman and CEO) and Derrick.

*Post-Agreement Events*

18.    During the year ended September 30, 2010, Activecare entered into a consulting agreement with ADP in which it agreed to pay ADP $260,000 in compensation plus warrants to purchase common stock.  ADP also provided a $100,000 short-term loan to ActiveCare, which was repaid to ADP without interest prior to year end.

19.     At the end of six (6) months from the date the Agreement was signed, Plaintiff notified ActiveCare, ADP and Dalton of his decision to exercise his Repurchase Option.

20.     Upon request and based upon representations of ActiveCare, ADP and Dalton that Plaintiff's investment would be profitable if he would allow additional time for ActiveCare to improve its financial condition, Plaintiff allowed additional time before exercising his Repurchase Option.

21.     On or about October 17, 2011, Dalton resigned as CEO, but continued serve as Chairman, of ActiveCare.

22.     Despite the additional time allowed, Plaintiff did not see the results he had hoped for and, as such, reiterated his decision to exercise his Repurchase Option in an e-mail to Dalton on December 6, 2011.  In response, Dalton, on behalf of ActiveCare, ADP, and himself, individually, represented that Plaintiff's investment would be returned via wire transfer.

23.     Despite repeated demands, ActiveCare did not return Plaintiff's investment as promised by Dalton, nor did ADP repurchase the Common Stock as required by the Repurchase Option.

24.     At first, ActiveCare, ADP and Dalton represented to Plaintiff that ActiveCare and ADP intended to comply with their obligations under the Agreement but needed additional time. ActiveCare, ADP, 4G, and Dalton then spent several months trying to convince Plaintiff to accept one of many investment proposals presented to him and invest additional funds into ActiveCare and 4G. During these presentations,

ActiveCare, ADP, 4G, and Dalton repeatedly reassured Plaintiff of ActiveCare's financial condition and positive outlook.

25.    ActiveCare was introduced to 4G in November of 2011.  On January 21, 2012, Dalton, individually and on behalf of ActiveCare and ADP sent Plaintiff correspondence regarding ActiveCare's process of raising money for two (2) acquisitions so he could "understand the synergies that they will create with ActiveCare" and the "game changers" for ActiveCare, one of them being the acquisition of 4G.

26.    On February 3, 2012, Dalton, on behalf of ActiveCare and ADP sent Plaintiff correspondence in which he commented upon the expense and undesirability of litigating the Agreement. Dalton, on behalf of ActiveCare and ADP, stated he was scrambling to meet Plaintiff's request "as the investment capital has been deployed" and he wanted to make sure that he could abide by any plan or date he agreed to. He also noted that his word had been what he has spent his professional life living by and nothing was more important to him. Finally, Dalton, on behalf of ActiveCare and ADP, gave Plaintiff his word that "the obligation in [his] contract will be met" but said he needed until February 15, 2012 to draft a plan "that will make all parties much happier" and to resolve the matter amicably.

27.    On or about February 16, 2012, Dalton was re-appointed as CEO of ActiveCare.

28.    On March 8, 2012, ActiveCare acquired 4G as a wholly owned subsidiary of ActiveCare.  Upon information and belief, 4G may have obtained some or all of the investment funds originally invested by Plaintiff pursuant to the Agreement.

29.     On March 15, 2012, Dalton, on behalf of ActiveCare and ADP represented to Plaintiff that his investment would be "backed by the assets of [ActiveCare], with nearly $25M USD spent to get to where it is today, and no other secured debt holders in line."

30.     On or about March 21, 2012, Dalton, individually, and on behalf of ActiveCare, ADP, and 4G, wrote a letter to Plaintiff to thank Plaintiff for meeting with him, for receiving the presentation, and for his willingness to further his position with ActiveCare as Dalton's partner. The letter was written on Dalton's personal letterhead, and not the letterhead of ActiveCare.

31.     On or about March 21, 2012, Dalton, individually, and on behalf of ActiveCare, ADP, and 4G, wrote a letter to Plaintiff outlining the terms in which ActiveCare, ADP, 4G and Dalton intended to handle Plaintiff's $1M investment, secure an additional partnership arrangement by loaning $1.5M to 4G, and possibly arrange for an additional $5M investment. With respect to the $1M investment, Dalton, individually, and on behalf of ActiveCare, ADP, and 4G, specified that ActiveCare would agree "to repurchase this debenture from you after 1 year from the date of this letter should you decide to exit the opportunity." Plaintiff's additional $1.5M investment was to have the same repurchase option. Dalton, individually and on behalf of ActiveCare, ADP, and 4G, further stated: "the $1.5M allows the Company to satisfy its business plan… with no additional funding coming into the ActiveCare Inc. The Company will not go out of business as a result of not raising funds past your additional $1.5M and I am confident we

will be able to perform on the investment to your complete satisfaction." The letter was not written on the letterhead of ActiveCare.

32.     On May 15, 2012, Dalton, on behalf of ActiveCare, ADP, and 4G, wrote a letter to Plaintiff regarding the business plan proposals presented to Plaintiff and ActiveCare's financial condition.  In the letter, Dalton, on behalf of ActiveCare, ADP, and 4G, represented ActiveCare was estimated to add 1,357 new members by the end of June 2012 and 4,300 members by the end of 2012, and that the figures could easily triple with proper funding.  Dalton, on behalf of ActiveCare, ADP, and 4G, also represented the signing of six (6) Third Party Administrators which gave ActiveCare the opportunity to produce $330 million in recurring annual revenues. He stated, on behalf of ActiveCare, ADP, and 4G, his belief that ActiveCare's worth will exceed $1 billion or in excess of $10 per share. Dalton, on behalf of ActiveCare, ADP, and 4G, also encouraged Plaintiff that, though he and his partner Derrick (who was also an owner of ADP) were running short on needed capital and ActiveCare was not ready for a financial institution type of partner, Plaintiff would make an excellent partner to build ActiveCare.  He then represented, on behalf of ActiveCare, ADP, and 4G, that, after already receiving a return of his $1 million investment, Plaintiff would make $10,900,000 in profits if the stock price increases to $2.00 per share in 2013.

33.     On or about May 15, 2012, Dalton, on behalf of ActiveCare, ADP, and 4G provided Plaintiff with an Investment Proposal to delineate how Plaintiff can get back his $1M already invested that contained numerous representations regarding ActiveCare's and 4G's financial condition and outlook. Specifically, but without limitation, the

Proposal included quarterly revenues and net income of 4G and stated that the traction 4G established had exceed expectations, but 4G needed to borrow $1.5M from Plaintiff to meet its business plan objective.

34.     On or about May 15, 2012, Dalton, on behalf of ActiveCare and 4G, presented Plaintiff with a proposed Loan Agreement to be executed between ActiveCare, 4G, and Plaintiff, among other proposed documents. The Testament of Complete Document Package noted that the documents were provided to Plaintiff for the purpose of securing an additional $1.5M investment.

35.     On or about July 3, 2012, Dalton, on behalf of ActiveCare and 4G, presented Plaintiff with a business plan of ActiveCare and 4G that contained many representations related to the business plans and revenue projections of ActiveCare and 4G.`

36.     On July 12, 2012, Dalton resigned and Derrick was appointed as CEO and Chairman of ActiveCare.  At the time, Derrick was also affiliated with ADP.  He served as CEO of ActiveCare until September 30, 2014, and as Chairman of ActiveCare until April of 2015.

37.     After his resignation, Dalton continued to serve ActiveCare as a consultant until April of 2015.  As a consultant, ActiveCare paid Dalton over $120,000 for the year ended September 30, 2012, and $300,000 for the year ended September 30, 2013, as well as bonus payments ranging from 5% to 10% on financing he raised for ActiveCare, and additional amounts for the year ended September 30, 2014 and continuing until March of 2015.

38.     On or after July 26, 2012, Dalton, individually and on behalf of ActiveCare, ADP, and 4G, presented Plaintiff with a Valuation Report of Excel Management Systems, Inc. which contained numerous representations related to the purported fair market value of ActiveCare as of July 2, 2012.

39.     On or around August 22, 2012, Dalton wrote a letter to Plaintiff.  In it, Dalton, individually and on behalf of ActiveCare, ADP, and 4G, represented that: "[i]n the 4G section, ActiveCare will have over 50,000 members by the end of 2014 with revenues of over $50 million," presented revenue projections for September through December of 2012 "to reach an annual revenue run rate over $12 million," and stated that ActiveCare was raising $3.1M through a securitized convertible debenture, among other representations.

40.     On August 27, 2012, Dalton sent an e-mail to Plaintiff in which he noted, individually and on behalf of ActiveCare, ADP, and 4G, that the promise made to Plaintiff in March regarding ActiveCare's business plan had been exceeded.

41.     In September of 2012, Plaintiff met with Dalton and other representatives of ActiveCare, ADP, and 4G to discuss the proposed terms of the anticipated $1M and $1.5M loan agreements and promissory notes under which Plaintiff's $1M original investment would be converted into a two-year loan. The agreements and notes were never executed. However, several representations were made to Plaintiff by Dalton and other representatives of ActiveCare, ADP and/or 4G during the discussions, including without limitation those contained in the September 2012 presentation of ActiveCare.

42.     On January 17, 2013, Dalton, individually and on behalf of ActiveCare, ADP, and 4G, sent an e-mail to Plaintiff to update him as to the "exciting progress" being made and the "exponential growth" at ActiveCare.

43.     On March 7, 2013, Dalton, individually and on behalf of ActiveCare, ADP, and 4G, sent an e-mail to Plaintiff to inform him that they were "working on a solution to [Plaintiff's] outstanding problem."

44.     As it turned out, the solution was a 10-for-1 reverse stock split for the common stock of ActiveCare on May 16, 2013, which decreased the number of ActiveCare's outstanding shares and convertible shares of "freestanding" instruments, and converted Plaintiff's one (1) million shares into 100,000 shares of ActiveCare common stock.

45.     In October of 2014, the Securities and Exchange Commission instituted proceedings related to allegations that between September 2007 and January 2010, while Dalton and Derrick were officers and directors of SecureAlert, ActiveCare's former parent company, that Dalton and Derrick failed to disclose their personal financing of certain transactions to other Board members and employees of SecureAlert and, in relation, overstated revenue in the company's financial statements by $2 million. Without admitting or denying liability, Dalton agreed to an injunction and a civil penalty of $65,000, and Derrick agreed to an injunction and a civil penalty of $232,500, and agreed not to act as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act or that is required to file reports under Section 15(d) of the Exchange Act.

46.     Dalton returned to ActiveCare as Chairman and CEO in April of 2015.

47.     In September of 2015, ActiveCare entered into a Consulting Agreement with ADP, an entity controlled by Derrick, pursuant to which ActiveCare agreed to pay for Derrick's health insurance premiums, plus $6,000 per month and a bonus of 15% of funds raised less costs.  The Consulting Agreement defined the consulting services as "any services reasonably requested by [ActiveCare] that are necessary or useful for the operation and growth of the Business."

48.     The representations of Defendants detailed above, among others, were false, and were made for the purpose of inducing Plaintiff to refrain from exercising his legal and equitable remedies due to ActiveCare and ADP's breach of the Repurchase Option of the Agreement.  As a result, Plaintiff sustained damages including without limitation the loss of his investment and a reverse stock split further devaluing his investment.

## COUNT 1
## BREACH OF CONTRACT (Against ActiveCare and ADP)

49.     Plaintiff incorporates by reference all of the allegations of this Complaint as if fully stated herein.

50.     The Agreement, entered into between Plaintiff, ActiveCare, and ADP, was a contract.

51.     Plaintiff performed his obligations as required by the terms and agreements of the Agreement.

52.     At the end of six (6) months from the date the Agreement was entered into, and on more than one occasion, Plaintiff exercised his right to require ADP to repurchase the Common Stock, as permitted by Section 2(b) of the Agreement.

53.     ActiveCare and ADP breached the Agreement by failing to repurchase the Common Stock within a reasonable time, as required by Section 2(b) of the Agreement and Utah law.

54.     The failure of ActiveCare and ADP to repurchase the Common Stock within a reasonable time is a material breach of ActiveCare and ADP's contractual duties to Plaintiff.

55.     ActiveCare and ADP are and remain indebted to Plaintiff for the principal amount of One Million and 00/100 Dollars ($1,000,000.00), exclusive of interest and costs of court as sought herein.

## COUNT 2
## IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## AGAINST ACTIVECARE AND ADP

56.     Plaintiff incorporates by reference all of the allegations of this Complaint as if fully stated herein.

57.     The Agreement contained an unwritten or implied promise that the parties would deal with each other fairly and in good faith.

58.     Plaintiff, ActiveCare, and ADP promised not to intentionally do anything to injure each other's right to receive the benefits of the Agreement.

59. ActiveCare and ADP violated this unwritten or implied promise by failing to repurchase the Common Stock, as required by Section 2(b) of the Agreement.

60. ActiveCare and ADP also violated this unwritten or implied promise by misrepresenting the financial condition of ActiveCare and 4G after Plaintiff exercised his right to require ADP to either repurchase the Common Stock or reset the purchase price and issue additional shares to compensate for the reset purchase price, as permitted by Section 2(b) of the Agreement.

61. ActiveCare and ADP also violated this unwritten or implied promise by engaging in "stall tactics" and by repeatedly suggesting to Plaintiff that ActiveCare and ADP intended to fulfill their contractual obligations under Section 2(b) of the Agreement, when in fact ActiveCare and ADP had no intentions of fulfilling said obligations.

## COUNT 3
## FRAUD AGAINST ACTIVECARE

62. Plaintiff incorporates by reference all of the allegations of this Complaint as if fully stated herein.

63. ActiveCare is also liable to Plaintiff for the fraud described above and for all damages and equitable remedies to which he may be entitled thereby.

64. As detailed above, ActiveCare made numerous representations to Plaintiff. In December of 2011, ActiveCare represented that Plaintiff's investment would be returned via wire transfer. ActiveCare then represented to Plaintiff that it intended to comply with its obligations under the Agreement but needed additional time. ActiveCare

then spent several months trying to convince Plaintiff to accept one of many investment proposals presented to him and invest additional funds into ActiveCare and 4G. During these presentations, ActiveCare repeatedly reassured Plaintiff of ActiveCare's financial condition and positive outlook.

65.     Specifically, and as detailed above, ActiveCare represented:

a.  on January 21, 2012, that it was raising money for acquisitions so Plaintiff could "understand the synergies that they will create with ActiveCare" and the "game changers" for ActiveCare;

b.  on February 3, 2012, that it was scrambling to meet Plaintiff's request "as the investment capital has been deployed" and it wanted to make sure that it could abide by any plan or date agreed to;

c.  on February 3, 2012, that "the obligation in [Plaintiff's] contract will be met" but it needed until February 15, 2012 to draft a plan "that will make all parties much happier" and resolve the matter amicably.

d.  on March 15, 2012, that Plaintiff's investment would be "backed by the assets of [ActiveCare], with nearly $25M USD spent to get to where it is today, and no other secured debt holders in line."

e.  on March 21, 2012, the terms in which Dalton, ADP, ActiveCare, and 4G intended to handle Plaintiff's $1M investment, secure an additional partnership arrangement by loaning $1.5M to 4G, and possibly arrange for an additional $5M investment;

f.  with respect to the $1M investment, that "the Company" would agree "to repurchase this debenture from you after 1 year from the date of this letter should you decide to exit the opportunity." Plaintiff's additional $1.5M investment was to have the same repurchase option.

g.  that "the $1.5M allows the Company to satisfy its business plan… with no additional funding coming into the ActiveCare Inc. The Company will not go out of business as a result of not raising funds past your additional $1.5M and I am confident we will be able to perform on the investment to your complete satisfaction";

h. on May 15, 2012, that ActiveCare was estimated to add 1,357 new members by the end of June 2012 and 4,300 members by the end of 2012, and that the figures could easily triple with proper funding; that the signing of six (6) Third Party Administrators gave ActiveCare the opportunity to produce $330 million in recurring annual revenues; that ActiveCare's worth will likely exceed $1 billion or in excess of $10 per share; that though Dalton and his partner Derrick were running short on needed capital and ActiveCare was not ready for a financial institution type of partner, Plaintiff would make an excellent partner to build ActiveCare; and that after already receiving a return of his $1 million investment, Plaintiff would make $10,900,000 in profits if the stock price increases to $2.00 per share in 2013;

i. on, May 15, 2012, an Investment Proposal to delineate how Plaintiff can get back his $1M already invested that contained numerous representations regarding ActiveCare's and 4G's financial condition and outlook including specifically, but without limitation, quarterly revenues and net income of 4G and a statement that 4G had exceeded expectations but needed to borrow $1.5M from Plaintiff to meet its business plan objective;

j. on May 15, 2012, a proposed Loan Agreement to be executed between ActiveCare, 4G, and Plaintiff, among other proposed documents for the purpose of securing an additional $1.5M investment;

k. on July 3, 2012, a business plan of ActiveCare and 4G relating to the business plans and revenue projections of ActiveCare and 4G;

l. on or after July 26, 2012, a Valuation Report of Excel Management Systems, Inc. relating to the purported fair market value of ActiveCare as of July 2, 2012;

m. on or around August 22, 2012, that: "ActiveCare will have over 50,000 members by the end of 2014 with revenues of over $50 million," and that ActiveCare was raising $3.1M through a securitized convertible debenture, among other representations;

n. on August 27, 2012, that the promise made to Plaintiff in March regarding ActiveCare's business plan had been exceeded;

o. in September of 2012, during a meeting with Plaintiff, the proposed terms of the anticipated $1M and $1.5M loan agreements and promissory notes under which Plaintiff's $1M original investment

would be converted into a two-year loan, including without limitation the statements contained in the September 2012 presentation of ActiveCare;

p.   on January 17, 2013, that "exciting progress" was being made and "exponential growth" at ActiveCare; and

q.   on March 7, 2013, that Dalton, ActiveCare, ADP, and 4G, were still "working on a solution to [Plaintiff's] outstanding problem";

66.   The representations concerned then-presently existing material facts relating to the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement.

67.   The representations of the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement were false.

68.   ActiveCare had knowledge of the falsity or made the representations recklessly knowing it had insufficient knowledge upon which to base its representations.

69.   ActiveCare intended that Plaintiff act upon the representations by refraining from exercising his legal and equitable remedies.

70.   Plaintiff reasonably and with ignorance of the falsities relied upon the representations of the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement, and was induced to refrain from exercising his legal and equitable remedies.

71.     Plaintiff suffered consequent and proximate injury and damage as a result, including without limitation the loss of his investment and a reverse stock split further devaluing his investment.

72.     Plaintiff further would show that 4G (predecessor in interest to and/or now known as ActiveCare Biometrics), ADP, ActiveCare, and Dalton were operating as alter egos for the purposes of perpetrating the above described fraud.  There was such unity of interest and ownership that the separate personalities of the companies and individual did not exist.  Observing the corporate form will sanction a fraud, promote injustice, and allow an inequitable result.

## COUNT 4
## FRAUD AGAINST ADP

73.     Plaintiff incorporates by reference all of the allegations of this Complaint as if fully stated herein.

74.     ADP is also liable to Plaintiff for the fraud described above and for all damages and equitable remedies to which he may be entitled thereby.

75.     As detailed above, ADP made numerous representations to Plaintiff.  In December of 2011, ADP represented that Plaintiff's investment would be returned via wire transfer. ADP then represented to Plaintiff that it intended to comply with its obligations under the Agreement but needed additional time. ADP then spent several months trying to convince Plaintiff to accept one of many investment proposals presented to him and invest additional funds into ActiveCare and 4G. During these presentations,

ADP repeatedly reassured Plaintiff of ActiveCare's financial condition and positive outlook.

76.     Specifically, and as detailed above, ADP represented:

a.  on January 21, 2012, that it was raising money for acquisitions so Plaintiff could "understand the synergies that they will create with ActiveCare" and the "game changers" for ActiveCare;

b.  on February 3, 2012, that it was scrambling to meet Plaintiff's request "as the investment capital has been deployed" and it wanted to make sure that it could abide by any plan or date agreed to;

c.  on February 3, 2012, that "the obligation in [Plaintiff's] contract will be met" but it needed until February 15, 2012 to draft a plan "that will make all parties much happier" and resolve the matter amicably.

d.  on March 15, 2012, that Plaintiff's investment would be "backed by the assets of [ActiveCare], with nearly $25M USD spent to get to where it is today, and no other secured debt holders in line."

e.  on March 21, 2012, the terms in which Dalton, ADP, ActiveCare, and 4G intended to handle Plaintiff's $1M investment, secure an additional partnership arrangement by loaning $1.5M to 4G, and possibly arrange for an additional $5M investment;

f.  with respect to the $1M investment, that "the Company" would agree "to repurchase this debenture from you after 1 year from the date of this letter should you decide to exit the opportunity." Plaintiff's additional $1.5M investment was to have the same repurchase option.

g.  that "the $1.5M allows the Company to satisfy its business plan… with no additional funding coming into the ActiveCare Inc. The Company will not go out of business as a result of not raising funds past your additional $1.5M and I am confident we will be able to perform on the investment to your complete satisfaction";

h.  on May 15, 2012, that ActiveCare was estimated to add 1,357 new members by the end of June 2012 and 4,300 members by the end of 2012, and that the figures could easily triple with proper funding; that the signing of six (6) Third Party Administrators gave ActiveCare the

opportunity to produce $330 million in recurring annual revenues; that ActiveCare's worth will likely exceed $1 billion or in excess of $10 per share; that though Dalton and his partner Derrick were running short on needed capital and ActiveCare was not ready for a financial institution type of partner, Plaintiff would make an excellent partner to build ActiveCare; and that after already receiving a return of his $1 million investment, Plaintiff would make $10,900,000 in profits if the stock price increases to $2.00 per share in 2013;

i.   on, May 15, 2012, an Investment Proposal to delineate how Plaintiff can get back his $1M already invested that contained numerous representations regarding ActiveCare's and 4G's financial condition and outlook including specifically, but without limitation, quarterly revenues and net income of 4G and a statements that 4G had exceeded expectations but needed to borrow $1.5M from Plaintiff to meet its business plan objective;

j.   on May 15, 2012, a proposed Loan Agreement to be executed between ActiveCare, 4G, and Plaintiff, among other proposed documents for the purpose of securing an additional $1.5M investment;

k.   on July 3, 2012, a business plan of ActiveCare and 4G relating to the business plans and revenue projections of ActiveCare and 4G;

l.   on or after July 26, 2012, a Valuation Report of Excel Management Systems, Inc. relating to the purported fair market value of ActiveCare as of July 2, 2012;

m.  on or around August 22, 2012, that: "ActiveCare will have over 50,000 members by the end of 2014 with revenues of over $50 million," and that ActiveCare was raising $3.1M through a securitized convertible debenture, among other representations;

n.   on August 27, 2012, that the promise made to Plaintiff in March regarding ActiveCare's business plan had been exceeded;

o.   in September of 2012, during a meeting with Plaintiff, the proposed terms of the anticipated $1M and $1.5M loan agreements and promissory notes under which Plaintiff's $1M original investment would be converted into a two-year loan, including without limitation the statements contained in the September 2012 presentation of ActiveCare;

p. on January 17, 2013, that "exciting progress" was being made and "exponential growth" at ActiveCare; and

q. on March 7, 2013, that Dalton, ActiveCare, ADP, and 4G, were still "working on a solution to [Plaintiff's] outstanding problem";

77. The representations concerned then-presently existing material facts relating to the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement.

78. The representations of the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement were false.

79. ADP had knowledge of the falsity or made the representations recklessly knowing it had insufficient knowledge upon which to base its representations.

80. ADP intended that Plaintiff act upon the representations.

81. Plaintiff reasonably and with ignorance of the falsities relied upon the representations of the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement, and was induced to refrain from exercising his legal and equitable remedies.

82. Plaintiff suffered consequent and proximate injury and damage as a result, including without limitation the loss of his investment and a reverse stock split further devaluing his investment.

83. Plaintiff further would show that 4G, ADP, ActiveCare, and Dalton were operating as alter egos for the purposes of perpetrating the above described fraud. There

was such unity of interest and ownership that the separate personalities of the companies and individual did not exist. Observing the corporate form will sanction a fraud, promote injustice, and allow an inequitable result.

## COUNT 3
## FRAUD AGAINST DALTON

84.     Plaintiff incorporates by reference all of the allegations of this Complaint as if fully stated herein.

85.     Dalton is also liable to Plaintiff for the fraud described above and for all damages and equitable remedies to which he may be entitled thereby.

86.     As detailed above, Dalton made numerous representations to Plaintiff. In December of 2011, Dalton represented that Plaintiff's investment would be returned via wire transfer. Dalton then represented to Plaintiff that ActiveCare and ADP intended to comply with their obligations under the Agreement but needed additional time. Dalton then spent several months trying to convince Plaintiff to accept one of many investment proposals presented to him and invest additional funds into ActiveCare and 4G. During these presentations, Dalton repeatedly reassured Plaintiff of ActiveCare's and 4G's financial condition and positive outlook.

87.     Specifically, and as detailed above, Dalton represented:

   a. on January 21, 2012, that he was raising money for acquisitions so Plaintiff could "understand the synergies that they will create with ActiveCare" and the "game changers" for ActiveCare;

b. on February 3, 2012, that he was scrambling to meet Plaintiff's request "as the investment capital has been deployed" and it wanted to make sure that it could abide by any plan or date agreed to;

c. on February 3, 2012, that "the obligation in [Plaintiff's] contract will be met" but it needed until February 15, 2012 to draft a plan "that will make all parties much happier" and resolve the matter amicably.

d. on March 15, 2012, that Plaintiff's investment would be "backed by the assets of [ActiveCare], with nearly $25M USD spent to get to where it is today, and no other secured debt holders in line."

e. on March 21, 2012, the terms in which Dalton, ADP, ActiveCare, and 4G intended to handle Plaintiff's $1M investment, secure an additional partnership arrangement by loaning $1.5M to 4G, and possibly arrange for an additional $5M investment;

f. with respect to the $1M investment, that "the Company" would agree "to repurchase this debenture from you after 1 year from the date of this letter should you decide to exit the opportunity." Plaintiff's additional $1.5M investment was to have the same repurchase option.

g. that "the $1.5M allows the Company to satisfy its business plan… with no additional funding coming into the ActiveCare Inc. The Company will not go out of business as a result of not raising funds past your additional $1.5M and I am confident we will be able to perform on the investment to your complete satisfaction";

h. on May 15, 2012, that ActiveCare was estimated to add 1,357 new members by the end of June 2012 and 4,300 members by the end of 2012, and that the figures could easily triple with proper funding; that the signing of six (6) Third Party Administrators gave ActiveCare the opportunity to produce $330 million in recurring annual revenues; that ActiveCare's worth will likely exceed $1 billion or in excess of $10 per share; that though he and his partner Derrick were running short on needed capital and ActiveCare was not ready for a financial institution type of partner, Plaintiff would make an excellent partner to build ActiveCare; and that after already receiving a return of his $1 million investment, Plaintiff would make $10,900,000 in profits if the stock price increases to $2.00 per share in 2013;

i. on, May 15, 2012, an Investment Proposal that contained numerous representations regarding ActiveCare's and 4G's financial condition and

outlook including specifically, but without limitation, quarterly revenues and net income of 4G and a statements that 4G had exceeded expectations but needed to borrow $1.5M from Plaintiff to meet its business plan objective;

j. on May 15, 2012, a proposed Loan Agreement to be executed between ActiveCare, 4G, and Plaintiff, among other proposed documents for the purpose of securing an additional $1.5M investment;

k. on July 3, 2012, a business plan of ActiveCare and 4G relating to the business plans and revenue projections of ActiveCare and 4G;

l. on or after July 26, 2012, a Valuation Report of Excel Management Systems, Inc. relating to the purported fair market value of ActiveCare as of July 2, 2012;

m. on or around August 22, 2012, that: "ActiveCare will have over 50,000 members by the end of 2014 with revenues of over $50 million," and that ActiveCare was raising $3.1M through a securitized convertible debenture, among other representations;

n. on August 27, 2012, that the promise made to Plaintiff in March regarding ActiveCare's business plan had been exceeded;

o. in September of 2012, during a meeting with Plaintiff, the proposed terms of the anticipated $1M and $1.5M loan agreements and promissory notes under which Plaintiff's $1M original investment would be converted into a two-year loan, including without limitation the statements contained in the September 2012 presentation of ActiveCare;

p. on January 17, 2013, that "exciting progress" was being made and "exponential growth" at ActiveCare; and

q. on March 7, 2013, that he, ActiveCare, ADP, and 4G, were still "working on a solution to [Plaintiff's] outstanding problem";

88.    The representations concerned then-presently existing material facts relating to the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement.

89.     The representations of the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement were false.

90.     Dalton had knowledge of the falsity or made the representations recklessly knowing he had insufficient knowledge upon which to base his representations.

91.     Dalton intended that Plaintiff act upon the representations by refraining from exercising his legal and equitable remedies.

92.     Plaintiff reasonably and with ignorance of the falsities relied upon the representations of the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement, and was induced to refrain from exercising his legal and equitable remedies.

93.     Plaintiff suffered consequent and proximate injury and damage as a result, including without limitation the loss of his investment and a reverse stock split further devaluing his investment.

94.     Dalton is individually liable for the representations he made to Plaintiff in his individually capacity, as well as those he made while serving as a consultant to ActiveCare.  During that times that he was serving as an officer of ActiveCare, Dalton is individually liable for the representations he made to Plaintiff because they were acts or representations of his own or in which he participated, even though his acts and representations may have been in furtherance of the corporate business.  *See Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35, 37 (Utah 2003).

95.     Plaintiff further would show that Dalton is individually liable because he was using ActiveCare, ADP, and 4G as his alter ego for the purposes of perpetrating the above described fraud.

## COUNT 6
## FRAUD AGAINST 4G

96.     Plaintiff incorporates by reference all of the allegations of this Complaint as if fully stated herein.

97.     4G is also liable to Plaintiff for the fraud described above and for all damages and equitable remedies to which he may be entitled thereby.

98.     As detailed above, 4G made numerous representations to Plaintiff.  4G spent several months trying to convince Plaintiff to accept one of many investment proposals presented to him and invest additional funds into ActiveCare and 4G. During these presentations, ActiveCare repeatedly reassured Plaintiff of ActiveCare's and 4G's financial condition and positive outlook.

99.     Specifically, and as detailed above, 4G represented:

a.  on March 21, 2012, the terms in which Dalton, ADP, ActiveCare, and 4G intended to handle Plaintiff's $1M investment, secure an additional partnership arrangement by loaning $1.5M to 4G, and possibly arrange for an additional $5M investment;

b.  with respect to the $1M investment, that "the Company" would agree "to repurchase this debenture from you after 1 year from the date of this letter should you decide to exit the opportunity."  Plaintiff's additional $1.5M investment was to have the same repurchase option.

c.  that "the $1.5M allows the Company to satisfy its business plan… with no additional funding coming into the ActiveCare Inc.  The Company

will not go out of business as a result of not raising funds past your additional $1.5M and I am confident we will be able to perform on the investment to your complete satisfaction";

d.   on, May 15, 2012, an Investment Proposal that contained numerous representations regarding ActiveCare's and 4G's financial condition and outlook including specifically, but without limitation, quarterly revenues and net income of 4G and a statements that 4G had exceeded expectations but needed to borrow $1.5M from Plaintiff to meet its business plan objective;

e.   on May 15, 2012, a proposed Loan Agreement to be executed between ActiveCare, 4G, and Plaintiff, among other proposed documents for the purpose of securing an additional $1.5M investment;

f.   on July 3, 2012, a business plan of ActiveCare and 4G relating to the business plans and revenue projections of ActiveCare and 4G;

g.   on or after July 26, 2012, a Valuation Report of Excel Management Systems, Inc. relating to the purported fair market value of ActiveCare as of July 2, 2012;

h.   on or around August 22, 2012, that: "ActiveCare will have over 50,000 members by the end of 2014 with revenues of over $50 million," and that ActiveCare was raising $3.1M through a securitized convertible debenture, among other representations;

i.   on August 27, 2012, that the promise made to Plaintiff in March regarding ActiveCare's business plan had been exceeded;

j.   in September of 2012, during a meeting with Plaintiff, the proposed terms of the anticipated $1M and $1.5M loan agreements and promissory notes under which Plaintiff's $1M original investment would be converted into a two-year loan, including without limitation the statements contained in the September 2012 presentation of ActiveCare;

k.   on January 17, 2013, that "exciting progress" was being made and "exponential growth" at ActiveCare; and

l.   on March 7, 2013, that Dalton, ActiveCare, ADP, and 4G, were still "working on a solution to [Plaintiff's] outstanding problem";

100.    The representations concerned then-presently existing material facts relating to the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement.

101.    The representations of the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement were false.

102.    4G had knowledge of the falsity or made the representations recklessly knowing it had insufficient knowledge upon which to base its representations.

103.    4G intended that Plaintiff act upon the representations by refraining from exercising his legal and equitable remedies.

104.    Plaintiff reasonably and with ignorance of the falsities relied upon the representations of the financial condition of ActiveCare and intentions of ActiveCare and ADP to fulfill their contractual obligations under Section 2(b) of the Agreement, and was induced to refrain from exercising his legal and equitable remedies.

105.    Plaintiff suffered consequent and proximate injury and damage as a result, including without limitation the loss of his investment and a reverse stock split further devaluing his investment.

106.    Plaintiff further would show that 4G, ADP, ActiveCare, and Dalton were operating as alter egos for the purposes of perpetrating the above described fraud.  There was such unity of interest and ownership that the separate personalities of the companies

and individual no longer exist. Observing the corporate form will sanction a fraud, promote injustice, and allow an inequitable result.

## COUNT 7
## CONSPIRACY TO COMMIT FRAUD AGAINST ALL DEFENDANTS

107.    Plaintiff incorporates by reference all of the allegations of this Complaint as if fully stated herein.

108.    Defendants were acting in a conspiracy to commit fraud.

109.    There was an agreement among and meeting of the minds of Dalton, ActiveCare, ADP, and 4G, to try to convince Plaintiff to invest additional funds into ActiveCare and 4G, rather than exercising his legal and equitable remedies, by repeatedly misrepresenting to Plaintiff that ActiveCare and 4G were financially stable and had a positive outlook, that ActiveCare and ADP intended to fulfill their contractual obligations under Section 2(b) of the Agreement, and that Plaintiff could get back the $1M he invested. Defendants agreed to act in concert in making the misrepresentations to Plaintiff.

110.    There were multiple overt acts by Dalton, ActiveCare, ADP, and 4G, in furtherance of their scheme, including without limitation the efforts described in Paragraphs 65, 76, 87, and 99, above.

111.    As a result of this conspiracy, Dalton, ActiveCare, ADP, and 4G, should be held jointly and severally liable for the conduct of the other co-conspirators and the damages that Plaintiff sustained as a proximate result thereof, including without

limitation the loss of his investment and a reverse stock split further devaluing his investment.

112.    Plaintiff further would show that 4G (predecessor in interest to and/or now known as ActiveCare Biometrics) ADP, ActiveCare, and Dalton were operating as alter egos for the purpose of perpetrating the above described conspiracy to commit fraud. There was such unity of interest and ownership that the separate personalities of the companies and individual did not exist. Observing the corporate form will sanction a fraud, promote injustice, and allow an inequitable result.

## CONDITIONS PRECEDENT

113.    All conditions precedent to Plaintiff's claims for relief have occurred or have been performed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in his favor and against the Defendants, jointly and severally to the extent allowed by law, as follows:

1.    For all forms of damages as may be allowed, in such sums as may be proven at trial;

2.    For all equitable remedies as may be allowed, in the form of, without limitation, disgorgement, and restitution;

3.    For each and every remedy allowed by statute;

4.    For Actual or Expectancy Damages in the amount of $1,000,000.00;

5.    For Consequential damages in an amount to be proven at trial;

6.    For Exemplary damages in an amount to be proven at trial

7.      For pre- and post-judgment interest at the maximum rate allowed by agreement and/or by law, whichever is greater;

8.      For all of Plaintiff's reasonable and necessary attorney fees, as may be allowed at law, in equity, by contract, statute (including without limitation Utah Code Ann. § 78B-5-825), rule, inherent power of the Court or otherwise;

9.      For all of Plaintiff's costs and expenses as may be allowed at law, in equity, by contract, statute, rule, inherent power of the Court or otherwise;

10.     For all other relief to which the proof may show entitled as allowed by Rule 54(c); and

11.     For all such other and further relief as the Court deems just, equitable and proper.


Dated this 4th day of April, 2016.


By:  */s/ Murphy S. Klasing*
      Murphy S. Klasing
      WEYCER, KAPLAN, PULASKI & ZUBER, P.C.
      Attorneys for Plaintiff FOUZI AL-FOUZAN

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of April, 2015, I caused the foregoing document to be filed via ECF which provided electronic notice to all counsel of record listed below. I further certify that a true and correct copy of the foregoing document was additionally delivered to all counsel of record below via United States Mail.

Mr. Erik A. Christiansen
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111

*/s/ Murphy Klasing*
Murphy Klasing